**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| KWA'SHAWN STRICKLAND, | : | |
| Plaintiff, | : | Civil Action No. _____ |
| v. | : | |
| ALBANUS ROCKLAND APARTMENTS, LLC, WE MANAGEMENT, LLC, BSD EQUITY HOLDINGS, LLC, and TAWIL PROPERTIES, LLC, | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Kwa'Shawn Strickland, by and through his undersigned counsel, Reed Smith LLP, hereby alleges as follows:

### NATURE OF THE CASE

1.      This is a landlord tenant case in which Plaintiff seeks to recover for the egregious misconduct practiced upon him by his landlord and its management company, in violation of the federal Fair Housing Act (as amended) ("FHAA"), the Fair Debt Collection Practices Act ("FDCPA"), Pennsylvania statutory law, and the common law.

2.      Plaintiff has tried repeatedly to get the attention of Defendants to rectify the numerous issues identified in this complaint, but nothing has worked.  As such, this complaint is necessary.

### PARTIES

3.      Plaintiff Kwa'Shawn Strickland ("Plaintiff") is an individual living and domiciled in the Commonwealth of Pennsylvania, with an address at 1309 W. Rockland Street, Apt. A-8,

Philadelphia, PA 19141.

4. Defendant Albanus Rockland Apartments, LLC ("Albanus") is a limited liability company formed and operating under the laws of the State of New Jersey, with a principal address of 701 Cross Street, Lakewood, NJ 08711.

5. Defendant WE Management, LLC ("WE") is a limited liability company formed and operating under the laws of the State of New Jersey, with a principal address of 701 Cross Street, Lakewood, NJ 08711.

6. Defendant BSD Equity Holdings, LLC ("BSD") is a limited liability company formed and operating under the laws of the State of New Jersey, with a principal address of 701 Cross Street, Lakewood, NJ 08711.

7. Defendant TAWIL Properties, LLC ("Tawil") is a limited liability company formed and operating under the laws of the State of New Jersey, with a principal address of 701 Cross Street, Lakewood, NJ 08711.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff alleges claims arising under a federal statutes, including 42 U.S.C. §§ 3601, *et seq*., and 15 U.S.C. §§ 1692, *et seq.* This Court therefore also has supplemental jurisdiction over Plaintiff's pendant state law claims pursuant to 28 U.S.C. § 1367(a) because they arise out of the same facts and circumstances giving rise to Plaintiff's federal claims.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions which form the basis for this complaint arose in the geographical area which is contained within the Eastern District of Pennsylvania.

## BACKGROUND FACTS

**A.    Plaintiff and the Property**

10.    Plaintiff is a 33-year-old disabled citizen of Pennsylvania.

11.    Plaintiff has been disabled since approximately March 2023, at which time, in connection with his disability, he was required to commence regular dialysis treatments three times each week, with each treatment lasting approximately four hours – treatment which continues on that schedule to this day.

12.    Because Plaintiff is disabled, he is eligible to receive, and in fact receives, Social Security Disability Insurance ("SSDI") benefits from the United States government.

13.    According to publicly available property records published by the City of Philadelphia, Albanus, BSD, and TAWIL (collectively, "Owners") own, as tenants in common, the property, building, and improvements located at 1309 W. Rockland Street, Philadelphia, PA 19141 (the "Property").

14.    At all times since November 18, 2023, Plaintiff has rented Apartment A8 (the "Unit") at the Property and used the Unit as his primary residence in Pennsylvania.

15.    More specifically, Plaintiff rented the Unit pursuant to a lease agreement (i) entered into between Plaintiff and Albanus, (ii) signed by WE as "lessor", (iii) dated November 2, 2023, and (iv) having a rental term of November 18, 2023 through October 31, 2024 ("Original Lease").

16.    A true and correct copy of the Original Lease is attached hereto as **Exhibit A**.

17.    Thereafter, Plaintiff renewed his rental of the Unit pursuant to a lease agreement (i) entered into between Plaintiff and Albanus, (ii) signed by WE as "lessor", (iii) dated September 30, 2024, and (iv) having a rental term of November 11, 2024 through October 31, 2025 ("First Renewal Lease").

18.     A true and correct copy of the First Renewal Lease is attached hereto as **Exhibit B**.

19.     Thereafter, Plaintiff renewed his rental of the Unit pursuant to a lease agreement (i) entered into between Plaintiff and Albanus, (ii) signed by WE as "lessor", (iii) dated August 29, 2025, and (iv) having a rental term of November 1, 2025 through October 31, 2026 ("Second Renewal Lease").

20.     A true and correct copy of the Second Renewal Lease is attached hereto as **Exhibit C**.

21.     Plaintiff has satisfied all conditions of each of the Original Lease, First Renewal Lease, and Second Renewal Lease.

22.     At all times since November 18, 2023, WE has been the property manager at the Property and the primary point of contact for Plaintiff with respect to issues relating to the Unit and Property.

23.     In connection with its property management services, WE utilizes and makes available to tenants an electronic website portal (the "Portal") through which tenants at the Property can make payments, review payment history, make and monitor maintenance requests, and otherwise communicate with WE about the Property.

24.     WE also communicates with tenants, including Plaintiff, about the Property and the rental units (including the Unit), by email and text messages.

**B.**     **Relevant Terms of the Lease Agreements**

25.     The express terms of Plaintiff's lease agreements with Defendants provide that:

Parking is provided. Tenant agrees to park only cars, vans, suvs and motorcycles in the parking area. 1 vehicle is allowed per unit.

(Ex. A, Original Lease, § 1.17; Ex. B, First Renewal Lease, § 1.17; Ex. C, Second Renewal Lease, § 1.17).

26.     Part of the monthly Rent charged by Defendants to Plaintiff pursuant to the applicable lease agreements includes a fee for "Pest Control."  (Ex. A, Original Lease, § 1.7; Ex. B, First Renewal Lease, § 1.7; Ex. C, Second Renewal Lease, § 1.7).

27.     Part of the monthly Rent charged by Defendants to Plaintiff pursuant to the applicable lease agreements since November 1, 2024 includes a fee for "Liability to Landlord Insurance."  (Ex. B, First Renewal Lease, § 1.7; Ex. C, Second Renewal Lease, § 1.7).

28.     Each of the lease agreements also contains fee shifting provisions as follows:

> The Tenant agrees that any expenses and/or damages incurred as a result of a breach of the Lease Agreement including reasonable attorney's fees will be paid to the prevailing party. . . . [and]

> The Tenant agrees that any court costs and/or fees incurred as a result of a breach of the Lease Agreement will be paid to the Landlord or the prevailing party.

(Ex. A, Original Lease, § 1.27; Ex. B, First Renewal Lease, § 1.27; Ex. C, Second Renewal Lease, § 1.27).

C.     **The Deplorable Conditions of the Property**

29.     Since October 2024, the conditions at the Unit and Property were deplorable and constituted a gross risk of safety and health to Plaintiff and other tenants.

30.     The exceedingly poor habitability conditions include, without limitation mouse and roach infestations, recurring ceiling leaks and unabated mold growth, unrepaired water damage, unsanitary and poorly maintained hallways and common areas, egress doors that are locked and/or unopenable, and lack of adequate parking (as promised in the leases).

31.     A true and correct copy of a compilation of just a few photographs and screen shots from videos accurately depicting many (but not all) of these conditions at the Unit/Property are attached collectively hereto as **Exhibit D**.

32.    Plaintiff has repeatedly advised Defendants of these conditions and requested that Defendants take all necessary steps to remediate the issues, but Plaintiff's requests have been met by Defendants' silence, delays, and/or broken promises to fix the issues.

33.    By way of just one example, Plaintiff requested in approximately December 2025 that Defendants remove a dead mouse from behind his refrigerator because it caused a foul odor to fill the Unit, but despite repeated requests by Plaintiff and the promise of Defendants that they would correct same, Defendants never took any action.

34.    Then, when Plaintiff undertook to move his refrigerator himself to remove the dead mouse, he injured his foot and leg – an injury that Plaintiff still suffers from today – and which would not have happened absent Defendants negligent refusal to take action.

35.    The insect (roaches and flies) infestation and the rodent (mice) infestation are particularly bad, have gone unremediated for years, and have caused Plaintiff to suffer the loss of food and medical supplies that were either contaminated or destroyed by the infestations.

36.    A true and correct copy of one email exchange between Plaintiff and Defendants, which spanned numerous months, in which Plaintiff makes repeated requests to the Defendants to cure these issues, is attached hereto as **Exhibit E**.

37.    A true and correct copy of screen shots from the Portal showing 42 historical maintenance requests submitted by Plaintiff to WE regarding the habitability issues at the Unit/Property, is attached hereto as **Exhibit F**.

38.    As of the date of filing this Complaint these deplorable conditions have not been remediated, but instead persist, and expose Plaintiff to ongoing and imminent risks to his health and safety.

**D.**   **Defendants Refuse to Provide Plaintiff a Reasonable Accommodation in the Form of Parking Spot, to which Plaintiff is Contractually Entitled**

39.     The express terms of Plaintiff's lease agreements with Defendants provide that:

Parking is provided. Tenant agrees to park only cars, vans, suvs and motorcycles in the parking area. 1 vehicle is allowed per unit.

(Ex. A, Original Lease, § 1.17; Ex. B, First Renewal Lease, § 1.17; Ex. C, Second Renewal Lease, § 1.17).

40.     Plaintiff has repeatedly demanded that Defendants provide the parking spot to which Plaintiff is contractually entitled.

41.     Plaintiff has also advised Defendants in writing that the promise of a parking spot in the lease agreements was a material inducement to Plaintiff agreeing to rent the Unit in the first place.

42.     However, Defendants have repeatedly refused to provide Plaintiff with a parking spot at the Property.

43.     Indeed, at no time during his tenancy at the Unit has Plaintiff been provided with the parking promised in his lease agreements.

44.     Defendants have at all times known of Plaintiff's disability because Plaintiff has disclosed and discussed his disability to WE.

45.     Plaintiff also disclosed his disability to WE when he explained, for income verification purposes inconnection with apply to rent the Unit, that he received SSDI benefits as his primary source of income.

46.     Among other things, Plaintiff has specifically informed WE representatives in verbal communications about the nature of Plaintiff's disability and the concomitant need for certain support services, including a parking spot close to the building due to Plaintiff's difficulty walking long distances and his need to drive regularly to numerous weekly dialysis appointments.

- 7 -

47.    Moreover, on April 22, 2026, Plaintiff expressly requested that a parking spot be provided both because Plaintiff is entitled to it under the express terms of the Original Lease, First Renewal Lease, and Second Renewal Lease, but also because providing the parking spot is a necessary and reasonable accommodation for Plaintiff given his disability and difficulty walking.

48.    A true and correct copy of a screen shot of relevant portions of the April 22, 2026 email Plaintiff sent to Defendants, described in the prior paragraph, is shown below:



49.    Defendants have failed and refused to respond to Plaintiff's requests, and as of the date of filing this complaint, Plaintiff still does not have a parking spot at the Property.

50.    Because Plaintiff has not been provided with the parking spot to which he is entitled, he has been forced to find parking elsewhere; when parking is available close to the Property, Plaintiff attempts to secure same by paying necessary amounts, but when parking is not readily available, Plaintiff occasionally needs to park in restricted areas because of his disability.

51.    As a result of the above, Plaintiff has incurred significant expense to park his vehicle and has amassed in excess of $800.00 in traffic/parking tickets and fines as a result of parking his vehicle on the street near the Property.

**E.** **Overview of Philadelphia Code Provisions Applicable to Residential Rentals in Philadelphia**

52.     Section 9-3902 of the Philadelphia Code requires that all residential rental properties be licensed, and states that "[n]o person shall collect rent . . . unless a valid rental license has been issued for the property." Phila. Code § 9-3902(1)(a).

53.     The Code further requires that a landlord "shall, at the inception of each tenancy, provide the tenant a Certificate of Rental Suitability that was issued by the Department no more than sixty days prior to the inception of the tenancy. The owner shall *at the same time* provide the tenant with a copy of the owner's attestation to the suitability of the dwelling unit as received by the Department pursuant § 9-3903(2)(b)(iii), *and* a copy of the 'City of Philadelphia Partners for Good Housing Handbook.'" Phila. Code § 9-3903(1)(a) (emphases added).

54.     In order to obtain a Certificate of Rental Suitability ("CRS"), the owner of the property is required to obtain "all required licenses with respect to the property, including a rental license." Phila. Code § 9-3903(2)(b)(i).

55.     According to the Philadelphia Code, "Any owner who fails to obtain a rental license as required by Section 9-3902, or to comply with Section 9-3903 regarding a [CRS] . . . shall be denied the right to recover possession of the premises or to collect rent during or for the period of noncompliance." Phila. Code § 9-3901(4)(e).

**F.** **Overview of Philadelphia Lead Paint Disclosure and Certification Ordinance (the "Lead Law"), Phila. Code § 6-800, et seq**

56.     The Lead Law was signed into law effective October 28, 1995. *See* Phila. Code, Chapter 6-800.

57.     The Lead Law has broad application to residential properties in the City and has been amended numerous times since 1995.

58.    In the context of residential rental properties, the most significant amendment became effective as of October 1, 2020.  *See* City of Philadelphia, Bill No. 180936-A (approved October 2, 2019), effective October 1, 2020 ("2020 Amendment").

59.    Pursuant to the 2020 Amendment, the Lead Law provides that:

> . . . no lessor shall enter into a lease agreement with a lessee to rent any Targeted Housing, or a unit in such Targeted Housing, unless (.1) he or she provides the lessee with a valid certification prepared by a certified lead inspector stating that the property is either lead free or lead safe; (.2) the lessee acknowledges receipt of the certification by signing a copy; (.3) the lessor has provided to the Department of Public Health a copy of such certification. For purposes of this subsection (a), a lease agreement shall include a renewal of a lease agreement, including an automatic renewal, provided that, no certification shall be required upon renewal of a lease if a prior certification provided to the lessee remains valid . . .

Phila. Code § 6-803(3)(a).

60.    Pursuant to the Lead Law, "[u]pon entering into a lease agreement for Targeted Housing, the lessor shall (.1) provide a copy of the signed certification to the Department of Public Health"  Phila. Code § 6-803(c)(.1).

61.    The Lead Law also requires the Department of Public Health to publish, among other things, "A list of each rental unit, including the address and name of lessor, for which a certification was provided to the Department pursuant to [Phila Code. § (c)(.1))."  Phila. Code § 6-803(d)(.1) (hereafter, "Lead Certification List").

62.    Pursuant to the Lead Law, "a lease agreement shall include a renewal of a lease agreement, including an automatic renewal."  Phila. Code § 6-803(3)(a).

63.    The Lead Law also contains the following definitions:

(a)    "Lead Free" is defined to mean "[t]he circumstance in which the interior and exterior surfaces of a property do not contain any lead-based paint and the property contains no lead-contaminated soil or lead-contaminated dust."  Phila. Code § 6-802(8).

(b)    "Lead Safe" is defined to mean "[t]he circumstance in which a property is free of a condition that causes or may cause exposure to lead from lead-contaminated dust, lead-contaminated soil, deteriorated lead-based paint, deteriorated presumed lead-based paint, or other similar threat of lead exposure due to the condition of the property itself." Phila. Code § 6-802(9).

(c)    "Targeted Housing" is defined, in relevant part, to mean "property built before March 1978 (even if renovated thereafter) that is currently used as housing." Phila. Code § 6-802(14).

(d)    "Valid Certification" is defined to mean:

> For a certification that a property is lead safe, a certification based on an inspection no more than forty eight (48) months prior to the date a rental license for the premises is issued (or, if no rental license is issued, the date a lease is entered into) or the date of an application for a Family Child Day Care facility license. For a certification that a property is lead free, a certification based on an inspection performed at any time prior to the date a rental license for the premises is issued (or, if no rental license is issued, the date a lease is entered into) or any time prior to the date of an application for a Family Child Day Care facility license.

Phila. Code § 6-802(15).

64.    Prior to the 2020 Amendment, Targeted Housing was defined to specifically exclude, among other things, "[rental] dwelling units in which children aged six (6) and under do not and will not reside during the lease term." Phila. Code § 6-802(12) (effective April 6, 2017).

65.    In the 2020 Amendment, City Council ordained that "dwelling units in which children aged six (6) and under do not and will not reside during the lease term shall only qualify as Targeted Housing according to a transition schedule" (the "Transition Schedule"). Phila. Code § 6-802.1(1).

66.    The Transition Schedule required the City to be divided into four (4) "Regions" by

- 11 -

zip codes based upon the percentage of screened children in that zip code found to have blood lead levels elevated above a certain threshold.  Phila. Code § 6-802.1(1)(a)-(b).

67.    The Department of Public Health was charged with "post[ing] prominently on its website the zip code composition of each Region."  Phila. Code § 6-802.1(1)(b).

68.    The Transition Schedule adopted in the 2020 Amendment is as follows:

Dwelling units in which children aged six (6) and under do not and will not reside during the lease term shall only qualify as Targeted Housing as follows:

(.1)    From October 1, 2020, through March 31, 2021: only in Region I.

(.2)    From April 1, 2021, through September 30, 2021: only in Regions I and II.

(.3)    From October 1, 2021, through March 31, 2022: only in Regions I, II and III.

(.4)    From April 1, 2022, and thereafter: in Regions I, II, III and IV.

Phila. Code § 6-802.1(1)(c).

69.    According to the Department of Public Health, the Transition Schedule Regions include the zip codes in the following table, as reported on the City's website:

| License Renewal Date: | October 1, 2020 through March 31, 2021 | April 1, 2021 through September 30, 2021 | October 1, 2021 through March 31, 2022 | April 1, 2022 through September 20, 2022 |
|---|---|---|---|---|
| Zip Codes: | 19121 | 19102 | 19107 | 19103 |
| | 19131 | 19104 | 19118 | 19106 |
| | 19132 | 19119 | 19125 | 19111 |
| | 19133 | 19120 | 19128 | 19114 |
| | 19138 | 19122 | 19129 | 19115 |
| | 19139 | 19124 | 19130 | 19116 |
| | 19140 | 19126 | 19135 | 19123 |
| | 19141 | 19127 | 19145 | 19136 |
| | 19143 | 19134 | 19146 | 19147 |
| | 19144 | 19137 | 19148 | 19149 |
| | 19151 | 19142 | 19153 | 19150 |
| | | | | 19152 |
| | | | | 19154 |

(*See*  https://www.phila.gov/2019-10-22-rental-property-lead-certification-law/  (last  accessed

April 22, 2026)).

70.    The 2020 Amendment also establishes remedies for breach of the Lead Law, in relevant part, as follows:

> (3)    Where a lessor does not comply with any provision of Section 6-803, the lessee shall be entitled to bring an action in a court of competent jurisdiction and a prevailing lessee shall be entitled to the following remedies:
>
>> (a)    an order requiring the lessor to provide the required certification and the performance of the necessary work to make the property lead safe;
>>
>> (b)    damages for any harm caused by the failure to provide the certification;
>>
>> (c)    exemplary damages of up to two thousand dollars ($2,000);
>>
>> (d)    abatement and refund of rent for any period in which the lessee occupies the property without a required certification having been provided; and
>>
>> (e)    attorney's fees and costs.
>
> (4)    Where a lessor does not comply with any provision of subsection 6-803(3)(a), the lessor shall be denied the right to recover possession of the premises or to collect rent during or for the period of noncompliance. In any action for eviction or collection of rent, the owner shall attach either a copy of the certification required by subsection 6-803(3)(a) or documentation that the premises do not qualify as Targeted Housing.
>
> (5)    The provisions of this Ordinance shall be liberally construed to effectuate its purpose of disclosure.

Phila. Code § 6-809(3)-(5).

71.    The Lead Law further expressly states that its protections are not waivable under any circumstances, as set forth below:

> Any attempted waiver of this Ordinance shall be void and unenforceable. No waiver of rights under this Ordinance shall be implied, including by:
>
>> (a)    The passage of time during the term of a lease or so long as the lessee lawfully occupies the property.
>>
>> (b)    Appearance as a defendant in an eviction proceeding.

Phila. Code § 6-812.

**G.** **Defendants Violated the Philadelphia Code Rental Provisions**

72. At no time prior to or during Plaintiff's tenancy on the Property did any Defendant present to Plaintiff a valid CRS for the Property or Unit, as required by the Philadelphia Code.

73. Therefore, Defendants were prohibited from collecting any rent or other sums from Plaintiff until such time as they complied with the CRS requirements in the Philadelphia Code.

74. At no time prior to or during Plaintiff's tenancy on the Property did any Defendant present to Plaintiff a "valid certification prepared by a certified lead inspector stating that the [P]roperty is either lead free or lead safe." *See* Phila. Code § 6-803(3)(a).

75. In fact, Defendants could not comply with the Lead Law because the Property has ***never been*** certified as lead safe or lead free under the Lead Law.

76. Indeed, according to the publicly available Lead Certification List, the Property is "Not Certified" which is explained as follows: "This property does not have an active lead free and/or lead safe certification and has not registered as exempt. This property was likely built before 1978 and is likely a residential property.  Residential properties built before 1978 require lead certification before being rented."  (*See* Lead Certification List, available at: https://opendataphilly.org/datasets/lead-paint-certs/ (last accessed April 23, 2026)).

77. Therefore, Plaintiff is entitled to a full refund and abatement of all amounts paid to Defendants relating to the Plaintiff's tenancy at the Property because Defendants failed to comply with the Lead Law.

78. According to the payment ledger on the Portal (as of April 24, 2026), Defendants collected rent and other fees from Plaintiff in the amount of at least $30,326 for the Plaintiff's tenancy at the Unit.

**H.    Defendants Use Illegal and Deceptive Tactics**

79.    Although Defendants were prohibited from collecting any rent from Plaintiff, Defendants nevertheless demanded and collected rent from Plaintiff.

80.    Although Defendants were prohibited from collecting any rent and/or related amounts from Plaintiff, Defendants improperly charged late fees to Plaintiff for allegedly late rent payments – *i.e.* payments that were never owed.

81.    Defendants charged these improper late fees on numerous occasions, including in connection with November 2024 rent ($75), December 2024 Rent ($75), January 2025 rent ($75), February 2025 rent ($75), March 2025 rent ($75), July 2025 rent ($75), August 2025 rent ($75), December 2025 rent ($75), and April 2026 rent ($75) – for a total of at least $675.00 in late fees.

82.    Since January 2026, Defendants have been charging Plaintiff $10.50 monthly for "Damage Waiver – Renters Insurance" pursuant to a "Damage Waiver Program" even though Plaintiff never agreed to such charges, and the "Damage Waiver Program" has never been disclosed or explained to Plaintiff in writing or verbally.

83.    Defendants have advised Plaintiff on numerous occasions that rent and other amounts are owed to Defendants and are "past due" or constitute and "outstanding balance" on Plaintiff's account.

84.    Indeed, when Defendants contend a "past due" sum is owed, they cause to appear in the Portal several notices and/or demands for payment, such as those pictured in the screenshot below, taken from Plaintiff's Portal landing page on April 24, 2026:

- 15 -



85.     Defendants also use other improper means to attempt to collect amounts allegedly owed, including by threatening that Defendants will seek to evict Plaintiff by going to "the courts" if payment is not promptly made, as shown in the below text message received by Plaintiff from Defendants on April 17, 2024:



**H.      Plaintiff has Been Harmed by Defendants' Misconduct**

86.      As a result of the Defendants' misconduct as described more fully above, Plaintiff has suffered physical injuries, pain and suffering, emotional distress, frustration, anxiety, and loss of enjoyment of life.

87.      As a further result of Defendants' misconduct as more fully described above, Plaintiff has suffered a loss of the benefit of his bargain in entering into the leases, including without limitation the right to quietly enjoy and use the Unit and Property.

88.      As a further result of Defendants' misconduct as more fully described above, Plaintiff has suffered property damage and monetary losses, including without limitation rent and other amounts paid to Defendants and other out of pocket losses for parking, tickets/fines, and loss of personal property.

89.      As a further result of Defendants' misconduct as more fully described above, Plaintiff has been forced to waste countless hours of his life chasing Defendants to comply with their most fundamental obligations under the law and their contracts with Plaintiff – all of which has significantly detracted from Plaintiff's quality of life.

90.      As a further result of Defendants' misconduct, Plaintiff has been forced to endure unsanitary and unsafe living conditions, while trying to unsuccessfully find alternative living conditions in a difficult housing market.  As of the date of filing this complaint, Plaintiff continues his efforts to secure alternative, safe housing.

**COUNT I**
**VIOLATION OF THE FAIR HOUSING AMENDMENTS ACT**
**28 U.S.C. § 3604(f)(3)(B) ("FHAA"): Failure to Provide Reasonable Accommodation**
*(Plaintiff v. All Defendants)*

91.      Plaintiff incorporates all allegations in the preceding paragraphs as if set forth and alleged fully herein.

92.     The Fair Housing Act was "passed by Congress as Title VIII of the Civil Rights Act of 1968, and prohibits housing discrimination on the basis of, inter alia, race, gender, and national origin." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005). The Fair Housing Amendments Act ("FHAA") was adopted in 1988 and amends the FHA to expand its coverage to "individuals with disabilities." *Id.*

93.     The FHAA forbids housing discrimination against the disabled. One of its key provisions bans "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of [that person's] handicap." 42 U.S.C. § 3604(f)(2).

94.     Under the FHAA, "[D]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

95.     The Property and the Unit are both a "dwelling" as defined by the FHAA. *See* 42 U.S.C. § 3602(b).

96.     The Property is subject to, and not exempted from, the FHAA. *See* 42 U.S.C. § 3603(a)(2), (b).

97.     Plaintiff is an individual with a "handicap" as defined in the FHAA. *See* 42 U.S.C. § 3602(h).

98.     Plaintiff is an "aggrieved person" as defined in the FHAA. *See* 42 U.S.C. § 3602(i).

99.     Because of his disability, Plaintiff must attend and cannot miss his dialysis appointments on a regular schedule of three times per week, for approximately four hours at a time.

100. As a side effect of both his disability and the mandatory dialysis treatments, Plaintiff suffers from chronic fatigue, muscle cramps, shortness of breath, and swelling of his feet and ankles, all of which makes walking long distances difficult.

101. These symptoms are often at their worst just prior to dialysis treatments because of the build up of fluids in the body between treatments.

102. Because walking long distances is difficult under these conditions, Plaintiff cannot walk to public transportation depots/stops, but instead must drive.

103. For the same reason, Plaintiff needs to park his vehicle in a reliably close location so that his walk to and from the Unit is manageable.

104. Plaintiff repeatedly made a demand to Defendants for a designated parking spot on the Property to accommodate these needs.

105. Providing a designated parking spot to Plaintiff would be a reasonable accommodation that is necessary to afford Plaintiff the equal opportunity to use and enjoy his Unit in the same manner as every other non-disabled person living at the Property.

106. Indeed, the reasonableness of having a designated parking spot is further confirmed by the express promise of Defendants to provide Plaintiff a parking spot in the terms of the Original Lease, First Renewal Lease, and Second Renewal Lease.

107. Nevertheless, Defendants have failed and refused Plaintiff's repeated requests to make a designated parking spot available.

108. Defendants' conduct therefore violates the FHAA.

109. Defendants' conduct in failing to provide a reasonable accommodation to Plaintiff in the form of a designated parking spot is particularly egregious, malicious, wanton, and reckless, because Defendants expressly and specifically promised to provide a designated parking spot in

the terms of their written agreements with Plaintiff (*i.e.*, the Original Lease, First Renewal Lease, and Second Renewal Lease), but they have nevertheless refused to follow through.

110.    As a direct result of the Defendants' misconduct described above, Plaintiff has suffered physical harms such as exhaustion and physical pain in having to walk far distances to his vehicle when he could not find close parking; emotional distress, humiliation, embarrassment, anxiety, depression, loss of sleep; as well as out of pocket expenses in the form of payments to park his vehicle close to the Property (when parking was available) and parking tickets and fines incurred to park his vehicle close to the Property/Unit (when parking was not available).

111.    At all relevant times Defendants each acted through their respective employees, contractors, and or agents and each is therefore liable for the acts and omissions of their respective employees, contractors, and or agents under theories of *respondeat superior*, vicarious liability, master-servant, agency, and right of control, all of which are expressly invoked herein against Defendants.

112.    Further, at all relevant times, WE was acting as the property manager and express agent of Owners with respect to implementing and carrying out the rules, policies, practices, and services on the Property, including without limitation, matters related to parking.  Therefore, Owners are each vicariously liable for the conduct of WE.

**WHEREFORE**, Plaintiff respectfully requests the Court enter Judgment in his favor and against Defendants, in amount to be determined at trial, including an award of actual damages; damages for emotional distress, humiliation, embarrassment, stress, anxiety, and loss of sleep; ***punitive damages*** pursuant to 42 U.S.C. § 3613(c)(1); reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and other such relief as the Court deems equitable and just.

**COUNT II**
**VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT**
**15 U.S.C. § 1692, *et seq.* ("FDCPA")**
*(Plaintiff v. WE)*

113.    Plaintiff incorporates all allegations in the preceding paragraphs as if set forth and alleged fully herein.

114.    The allegedly past due rent charged by Defendants to Plaintiff constitutes a "debt" under the FDCPA because it was incurred by Plaintiff in a transaction for personal, family, or household purposes – namely the rental of the Unit as a primary personal residence. *See* 15 U.S.C. § 1692(a)(5).

115.    Plaintiff is a consumer under the FDCPA as one who has been alleged to owe a debt. *See* 15 U.S.C. § 1692(a)(3).

116.    WE is a debt collector under the FDCPA because it uses means of interstate commerce, including emails and the Portal, to conduct its business which involves regularly collecting or attempting to collect debts owed to the Owners. *See* 15 U.S.C. § 1692(a)(6).

117.    WE has used false, deceptive, and misleading representations or means in connection with the collection of debts allegedly owed by Plaintiff for past-due rents, because any such rents were not legally owed because Owners failed to provide a CRS to Plaintiff. *See* Phila. Code § 9-3901(4)(e).

118.    WE violated the FDCPA by: (i) using false, deceptive, and misleading representations, including about the amount, character, and legal status of the alleged debt, to collect or attempt to collected the allegedly past due rent, which was not legally owed, (*see* 15 U.S.C. § 1692(e)(2)(A), & (e)(10)); and (ii) threatening to seek eviction for non-payment of allegedly past due rent when such action could not legally be taken because of the lack of a CRS

and valid lead certification, pursuant to Phila. Code § 9-3901(4)(e) & Phila. Code § 6-809(4), (15 U.S.C. § 1692(e)(5)).

119. WE further violated the FDCPA by using unfair or unconscionable means to collect or attempt to collect debts from Plaintiff, including by charging and collecting late fees for the allegedly past due rent where such fees were not authorized by the lease agreements unless and until such monthly rent was past due – which was never the case due to Owners' failure to obtain a CRS and valid lead certification. *See* 15 U.S.C. § 1692(f)(1).

120. Plaintiff has paid allegedly past due rent and late fees in response to WE's unlawful debt collection activities described above.

121. Plaintiff is entitled to relief under the FDCPA, including an award of actual damages, statutory damages of $1,000, and "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1692(k).

**WHEREFORE**, Plaintiff respectfully requests the Court enter Judgment in his favor and against WE in amount to be determined at trial, including an award of actual damages, statutory damages, reasonable attorneys' fees and costs, and other such relief as the Court deems equitable and just.

**COUNT III**
**VIOLATION OF THE LEAD LAW, Phila. Code § 6-800, *et seq.***
***(Plaintiff v. All Defendants)***

122. Plaintiff incorporates all allegations in the preceding paragraphs as if set forth and alleged fully herein.

123. As of April 1, 2021 the Property was "Targeted Housing" as defined in the Lead Law. Phila. Code §§ 6-802(14) & 6-802.1.

124.    Therefore, when the Original Lease was executed, and when the both the First Renewal Lease and Second Renewal Lease was executed, the Property was subject to the Lead Law, which decreed that "no lessor shall enter into a lease agreement with a lessee to rent any Targeted Housing, or a unit in such Targeted Housing, unless (.1) he or she provides the lessee with a valid certification prepared by a certified lead inspector stating that the property is either lead free or lead safe; (.2) the lessee acknowledges receipt of the certification by signing a copy...." Phila. Code § 6-803(3)(a).

125.    Defendants did not provide a valid lead certification applicable to the Property/Unit to Plaintiff when entering into the Original Lease, First Renewal Lease, Second Renewal Lease, or at any other time.

126.    Defendants have never obtained a valid lead certification for the Property/Unit.

127.    Therefore, Defendants were prohibited from entering into any lease agreement or renewal thereof with Plaintiff, and Defendants were further prohibited from demanding and collecting rent from Plaintiff for any period of their noncompliance with the Lead Law.  *See* Phila. Code § 6-803(3)(a).

128.    Nevertheless, Defendants demanded and collected rent and other fees from Plaintiff in an amount in excess of $30,000 during the period of Defendants' noncompliance with the Lead Law.

129.    As a direct and proximate cause of Defendants' failure to comply with the Lead Law, Plaintiff has been caused actual damages in the amount of rent and other payments made.

130.    Pursuant to Phila. Code § 6-809(3), Plaintiff is entitled to exemplary damages of up to two thousand dollars ($2,000) for *each violation*; abatement and refund of rent for any period in which Defendants were in noncompliance with the Lead Law; and attorney's fees and costs.

131.    Plaintiff is therefore entitled to, *at a minimum*, rebate and refund of over $30,000 in rent paid to Defendants, $6,000.00 in exemplary damages ($2,000 x 3 violations), and an award of his attorneys' fees and litigation costs.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter Judgment in his favor and against Defendants, in amount to be determined at trial, including an award of actual damages, consequential damages, enhanced/exemplary damages, reasonable attorneys' fees, costs, and all other such relief as the Court deems equitable and just.

## COUNT IV
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. § 201-1 *et seq.* ("UTPCPL")
### *(Plaintiff v. All Defendants)*

132.    Plaintiff incorporates all allegations in the preceding paragraphs as if set forth and alleged fully herein.

133.    The UTPCPL prohibits  "passing off goods or services as those of another," "[r]epresenting  that goods or services have . . . approval, characteristics . . . uses [or] benefits that [they do] not have," "[r]epresenting that a person has approval [or] status . . . that he does not have," "[e]gaging in . . . fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4).

134.    The UTPCPL applies to real estate rental transactions.

135.    Plaintiff rented the Unit for his personal use.

136.    Defendants violated the UTPCPL by:

        a.    Falsely representing to Plaintiff that the Property and Unit was able to be rented in the City of Philadelphia by:

                i.    Holding out the Property and Unit to Plaintiff as being available for

rent when the Philadelphia Code prohibited rental of the Property and Unit due to Defendants' noncompliance with the Philadelphia Code CRS requirements and Lead Law;

ii.    Entering into the Original Lease, First Renewal Lease, and Second Renewal Lease with Plaintiff for a Unit that was not legally permitted to be rented to Plaintiff due to Defendants' noncompliance with the Philadelphia Code CRS requirements and Lead Law;

iii.    Representing in the Original Lease, First Renewal Lease, and Second Renewal Lease that Defendants would provide to Plaintiff a parking spot to induce his execution of the leases while knowing that Defendants would not provide the promised parking spot;

iv.    Demanding and collecting from Plaintiff rent and additional amounts, including late fees, which were not legally owed due to Defendants' noncompliance with the Philadelphia Code CRS requirements and Lead Law;

v.    Falsely representing to Plaintiff that rent and additional amounts were past due when such amounts were not legally owed due to Defendants' noncompliance with the Philadelphia Code CRS requirements and Lead Law;

vi.    Demanding and collecting from Plaintiff rent and additional amounts, including late fees, when the Property and Unit was unsafe, unsanitary, uninhabitable, or otherwise unfit for human habitation;

vii.    Repeatedly promising that Plaintiff's habitability concerns would be

- 25 -

addressed and/or remediated, and then failing to take action to address or remediate those issues;

viii.   Continually and systematically breaching the warranty of habitability for the Property and Unit; and

ix.   Charging Plaintiff for a "Damage Waiver Program" even though Plaintiff never agreed to such charges, and the "Damage Waiver Program" has never been disclosed or explained to Plaintiff in writing or verbally.

b.   Violating the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270.1, *et seq.*, as explained below:

i.   The FCEUA establishes that, among other things, the following conduct constitutes unfair methods of competition and unfair or deceptive acts or practices with regard to the collection of debts: "[using]. . . false, deceptive [and] misleading representation[s] or means in connection with the collection of [a] debt," *id.* § 2270.4(b)(5); making "false representation[s] of the character, amount, or legal status of [a] debt," *id.* § 2270.4(b)(5)(ii); "threaten[ing] to take [an] action that cannot legally be taken or that is not intended to be taken," *id.* § 2270.4(b)(5)(v)); "us[ing] false representation[s] or deceptive means[s] to collect or attempt to collect any debt," *id.* § 2270.4(b)(5)(x); and "us[ing] unfair or unconscionable means to collect or attempts to collect [a] debt," *id.* § 2270.4(b)(6).

ii. Owners are creditors under the FCEUA, 73 P.S. § 2270.3, as those  to whom a debt is alleged to be owed.

iii. WE is a debt collector under the FCEUA, 73 P.S. § 2270.3.

iv. Plaintiff is a consumer under the FCEUA, 73 P.S. § 2270.3, as one who is alleged to owe a debt.

v. The moneys sought to be collected by Defendants for allegedly past due rent and other charges constitute debts under the FCEUA, in that they result from Plaintiff's "lease [of] real or personal property for personal, family or household purposes."  73 P.S. § 2270.3.

vi. Defendants' conduct in violation of the FCEUA includes, but is not limited to the following:

 1. Representing through text messages, emails, and/or the Portal that sums of money were owed for rent and late fees when in fact Defendants were prohibited from collecting such moneys;

 2. Threatening eviction proceedings but either not intending to follow through or being legally unable to follow through because of Defendants' noncompliance with the Philadelphia Code CRS requirements and Lead Law;

 3. Collecting and attempting to collect rent payments and late fees while not in compliance with the Philadelphia Code CRS requirements and Lead Law.

vii. Pursuant to 73 P.S. § 2270.5(a), any violation of the FCEUA is a concomitant violation of, and enforceable through, the UTPCPL.

137. Plaintiff reasonably relied on the implied and actual misrepresentations and deceptive conduct of the Defendants.

138. As a direct and proximate result of the misrepresentations and deceptive conduct of Defendants, Plaintiff suffered ascertainable loss, including over $30,000 in payments made, plus additional out of pocket expenses.

**WHEREFORE**, Plaintiff respectfully requests the Court enter Judgment in his favor and against Defendants, in amount to be determined at trial, including an award of:

    c.   Actual damages;

    d.   Consequential damages;

    e.   Treble damages, pursuant to 73 P.S. § 201-9.2;

    f.   costs, reasonable attorneys' fees, witness fees, and other litigation costs, as authorized by 73 P.S. § 201-9.2;

    g.   pre- and post-judgment interest; and

    h.   such other relief as the Court deems equitable and just.

**COUNT V**
**<u>NEGLIGENCE</u>**
***(Plaintiff v. All Defendants)***

139. Plaintiff incorporates all allegations in the preceding paragraphs as if set forth and alleged fully herein.

140. Plaintiff repeatedly informed Defendants that there were numerous unsanitary and unsafe problems with the Unit and Property.

141. Defendants received Plaintiff's complaints about habitability and specifically undertook a duty to perform necessary repairs and remediation, and further, even promised and confirmed to Plaintiff that it would correct the habitability issues.

142.    Defendants had a specific duty to exercise reasonable care when undertaking to render services to Plaintiff to repair known dangerous, unsafe, and unsanitary conditions at the Property and Unit.

143.    Defendants breached that duty by failing to timely and/or properly remedy the conditions described above.

144.    As explained above, in at least once instance, Defendants failed to remove a dead mouse from under Plaintiff's refrigerator, and Plaintiff thereafter had to attempt to remove the dead rodent himself, and in so doing injured hid leg and foot, causing physical injury and pain which continues to this day.

145.    As a direct and proximate cause of the Defendants' breach of the duty of reasonable care, Plaintiff has suffered physical harms including physical injuries, loss of sleep, exhaustion, anxiety, frustration, and loss of the enjoyment of life, together with associated mental anguish of having to deal with and live in unsafe and unsanitary living conditions.

146.    Further, as a direct and proximate cause of the Defendants' breach of the duty of reasonable care, Plaintiff has suffered property damage and out of pocket losses in the form of ruined (not consumable) food and medical supplies contaminated and/or destroyed by the unremediated pest problems at the Unit and Property.

147.    Owners hired WE to be Owners agent and designee with respect to overseeing, managing, and attending to the duties imposed upon Owners by virtue of the leases and Pennsylvania law.

148.    At all material times, WE was employed by and acting on behalf of Owners, and therefore, Owners are liable for the acts and omissions of its respective employees, contractors,

and agents, including WE, under theories of *Respondeat Superior,* vicarious liability, master-servant, agency, and right of control, all of which are expressly invoked herein a.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter Judgment in his favor and against Defendants, in amount to be determined at trial, including an award of actual damages, consequential damages, reasonable attorneys' fees, costs, and all other such relief as the Court deems equitable and just.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**
*(Plaintiff v. Defendants)*

149.    Plaintiff incorporates all allegations in the preceding paragraphs as if set forth and alleged fully herein.

150.    Defendants had a duty to act with ordinary care to avoid making material misrepresentations to others, including Plaintiff, who would foreseeably rely on those misrepresentations to their detriment.

151.    Defendants breached this duty by negligently misrepresenting in the Original Lease, First Renewal Lease, and Second Renewal Lease (collectively, the "Leases") that Plaintiff would be provided with a parking spot.

152.    The promise of a parking spot was a material term of the Leases because it was a material inducement for Plaintiff, who needed a close parking spot due to his disability.

153.    Plaintiff therefore justifiably relied on Defendants' material misrepresentation when deciding to execute the Leases.

154.    As a direct and proximate result of Plaintiff's reliance on Defendants' misrepresentation, Plaintiff suffered actual losses because he did not receive the parking spot, the provision of which was paid for as part of his monthly rent.

155. As a direct and proximate result of Plaintiff's reliance on Defendants' misrepresentation, Plaintiff suffered additional out of pocket losses, including the amounts incurred to pay for parking/traffic tickets related to parking his vehicle.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter Judgment in his favor and against Defendants, in amount to be determined at trial, including an award of actual damages, consequential damages, reasonable attorneys' fees, costs, and all other such relief as the Court deems equitable and just.

**COUNT VII**
**INTENTIONAL MISREPRESENTATION/FRAUDULENT INDUCEMENT**
*(Plaintiff v. Defendants)*

156. Plaintiff incorporates all allegations in the preceding paragraphs as if set forth and alleged fully herein.

157. Defendants made a misrepresentation in the First Renewal Lease and Second Renewal Lease that Plaintiff would be provided with a parking spot.

158. The promise of a parking spot was a material term of the First Renewal Lease and Second Renewal Lease because it was a material inducement for Plaintiff, who needed a close parking spot due to his disability.

159. Defendants had actual knowledge that that they were falsely promising a parking spot in the First Renewal Lease and Second Renewal Lease because by the time of execution of the First Renewal Lease, Plaintiff had already demanded the parking spot as promised in the Original Lease – thereby putting Defendants on notice of their noncompliance with the contractual term.

160. Plaintiff justifiably relied on Defendants' material misrepresentation when deciding to execute the First Renewal Lease and Second Renewal Lease.

161.    As a direct and proximate result of Plaintiff's reliance on Defendants' misrepresentation, Plaintiff suffered actual losses because he did not receive the parking spot, the provision of which was paid for as part of his monthly rent.

162.    As a direct and proximate result of Plaintiff's reliance on Defendants' misrepresentation, Plaintiff suffered additional out of pocket losses, including the amounts incurred to pay for parking/traffic tickets related to parking his vehicle.

163.    Defendants' conduct was particularly malicious, willful, wanton and egregious because Plaintiff had already demanded the parking spot he was promised in the Original Lease, and Defendants not only ignored that demand, but made additional promises of a parking spot while knowing that they were making a promise they never intended to fulfill, thereby depriving Plaintiff of a material benefit of the contract to which he was induced to enter.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter Judgment in his favor and against Defendants, in amount to be determined at trial, including an award of actual damages, consequential damages, *punitive damages*, reasonable attorneys' fees, costs, and all other such relief as the Court deems equitable and just.

## COUNT VII
## BREACH OF CONTRACT
### *(Plaintiff v. Owners)*

164.    Plaintiff incorporates all allegations in the preceding paragraphs as if set forth and alleged fully herein.

165.    The Leases are each valid written and enforceable contracts between Plaintiff and Owners.

166.    Plaintiff has fulfilled all obligations under the Leases.

167.    Owners have breached Section 1.17 of each of the Leases by not providing Plaintiff with a parking spot as expressly provided therein.

168.    Owners' breaches of Section 1.17 of the Leases has caused Plaintiff damages, including a loss of the portion of his monthly rent that was paid in exchange for the parking spot, as well as consequential damages in the amount of parking fees paid by Plaintiff and at least $800 for parking fines and tickets incurred to park near the Property.

169.    Owners have breached Section 1.7 of each of the Leases by not providing Plaintiff with the "Pest Control" for which Plaintiff was being charged each month.

170.    Owners' breaches of the Section 1.7 Leases has caused Plaintiff damages in the amount of his monthly rent that was paid in exchange for "Pest Control" each month.

171.    Plaintiff is entitled to recover his reasonable attorneys' fees and costs incurred in prosecuting this claim for breach of contract, as set forth in each of the Leases at Section 1.27.

**WHEREFORE**, Plaintiff respectfully requests the Court enter Judgment in his favor and against Owners in amount to be determined at trial, including an award of actual damages, consequential damages, reasonable attorneys' fees, costs, and other such relief as the Court deems equitable and just.

### COUNT VIII
### BREACH OF IMPLIED WARRANTY OF HABITABILITY
*(Plaintiff v. Owners)*

172.    Plaintiff incorporates all allegations in the preceding paragraphs as if set forth and alleged fully herein.

173.    In every residential lease there is an implied warranty of habitability.

174.    Plaintiff repeatedly notified Defendants about the habitability issues with the Property and Unit, including those specifically described at length above.

- 33 -

175.    Owners breached the warranty of habitability because the Property and Unit were unsafe and/or unsanitary for at least the following reasons:

    i.    there is a persistent rodent/mouse infestation;

    j.    there is a persistent roach/insect infestation;

    k.    there is a persistent water leakage from the ceiling and walls;

    l.    there is unabated mold and other water damage.

176.    Owners' breaches of the implied warranty of habitability caused Plaintiff to suffer damages including but not limited to, out of pocket expenses, loss of property destroyed by the infestation, and the loss of enjoyment and use of the Unit and Property.

177.    In addition, as a direct result of being forced to live with and through the miserable conditions in the Property and Unit over several years, and requesting to no avail Owners' aid in remedying the numerous, significant habitability conditions in the property, Plaintiff has suffered emotional distress, anxiety, frustration, and loss of the enjoyment of life and the Property.

**WHEREFORE**, Plaintiff respectfully requests the Court enter Judgment in his favor and against Owners, in amount to be determined at trial, including an award reflecting the difference between the rent he paid and the diminution in value of the Unit and Property during his tenancy due to the conditions of the Property, all other actual damages, consequential damages, damages for his distress, anxiety, frustration, and loss of enjoyment of life and the Property, reasonable attorneys' fees, costs, and other such relief as the Court deems equitable and just.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests this Court enter an Order and grant Judgment in his favor and against Defendants, awarding the following relief:

    a.   Actual damages;

b.   Consequential damages;

c.   ***Punitive damages***;

d.   Statutory damages;

e.   Enhanced and/or treble damages;

f.   Damages for loss of the enjoyment of life and the loss of enjoyment and use of the Property;

g.   Costs, reasonable attorneys' fees, witness fees, and other litigation costs;

h.   Pre- and post-judgment interest;

i.   Delay damages; and

j.   Such other relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable

Respectfully Submitted,

**REED SMITH LLP**

s/*Mark W. Fidanza*
Mark W. Fidanza, Esq.
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
215-851-8100

*Attorneys for Plaintiff*

Dated:  April 29, 2026